1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                        DISTRICT OF IDAHO

10
                            ----oo0oo----
11

12  ADAM TODD SAETRUM,              CIV. NO. 1:13-425 WBS

13            Plaintiff,            MEMORANDUM AND ORDER RE: MOTION
                                    FOR SUMMARY JUDGMENT
14       v.

15  ADA COUNTY SHERIFF GARY
    RANEY, in his individual
16  capacity, DEPUTY ADA COUNTY
    SHERIFF JAKE VOGT, in his
17  individual capacity, DEPUTY
    ADA COUNTY SHERIFF TYLER
18  STENGER, in his individual
    capacity, ADA COUNTY
19  DETECTIVE KEVIN LOUWSMA, in
    his individual capacity, and
20  DEPUTY ADA COUNTY SHERIFF
    STEVE ROBINSON, in his
21  individual capacity,

22            Defendants.

23
                            ----oo0oo----
24

25          Plaintiff Adam Todd Saetrum filed this action under 42

26  U.S.C. § 1983 based on alleged excessive force and inadequate

27  medical care during his arrest and detention in Ada County,

28  Idaho.  Defendants now move for summary judgment on all of

                               1

1   plaintiff's claims pursuant to Federal Rule of Civil Procedure

2   56.

3   I.   Factual and Procedural Background

4        On February 26, 2013, undercover officer Matt Schneider

5   arranged to purchase marijuana from plaintiff in the parking lot

6   of the Boise Town Square Mall.  Defendant Sergeant Jason Vogt led

7   the Action Team that was assembled to arrest plaintiff after the

8   controlled buy, and defendant Deputy Tyler Stenger was a member

9   of that team.  Defendant Sergeant Steve Robinson led the

10  Narcotics Unit for the controlled buy, and defendant Detective

11  Kevin Louwsma was a member of that unit.

12       When Officer Schneider first saw plaintiff driving

13  toward the location where they agreed to meet, he observed and

14  informed the other officers that there were two unidentified

15  individuals in plaintiff's car.  After plaintiff entered Officer

16  Schneider's undercover white truck and showed Officer Schneider

17  the marijuana, Officer Schneider told plaintiff that he needed to

18  go inside the mall to get money from a friend and would be right

19  back.  After exiting his white truck, Officer Schneider informed

20  the other officers that plaintiff was in the passenger side of

21  his truck and the two unidentified individuals were in

22  plaintiff's car.

23       At that point, Sergeant Vogt and Deputy Stenger drove

24  toward Officer Schneider's truck to arrest plaintiff.  Two other

25  officers simultaneously drove toward plaintiff's car to confront

26  the two unidentified individuals.  As Sergeant Vogt approached

27  the white truck, plaintiff exited the truck and began walking

28  toward his car.  Sergeant Vogt drove toward plaintiff and

1   allegedly struck plaintiff with his patrol car, causing him to

2   fall to the ground.  Sergeant Vogt denies that he struck

3   plaintiff with his patrol car, but indicates that he may have

4   bumped plaintiff with the door of his patrol car when he excited

5   his vehicle.  After plaintiff regained his footing, Sergeant Vogt

6   immediately took him to the ground, allegedly causing him to hit

7   his head and suffer a loss of consciousness and a concussion.

8   Despite allegedly inflicting or observing this use of force,

9   Sergeant Vogt, Deputy Stenger, and Detective Louwsma did not

10  provide plaintiff with medical care.

11          Plaintiff initiated this civil rights lawsuit on

12  September 27, 2013.  After a series of successful motions to

13  dismiss, plaintiff filed his Third Amended Complaint on September

14  15, 2014.  The parties then agreed to extend the time in which

15  they could "amend claims and add additional parties," (Docket No.

16  96),[1] and plaintiff filed his Fourth Amended Complaint ("FAC") on

17  April 24, 2015, (Docket No. 115).  Plaintiff's FAC asserts five

18  claims: 1) a § 1983 claim for violation of plaintiff's right to

19  substantive due process against Sergeant Vogt; 2) a § 1983 claim

20  for excessive force in violation of the Fourth Amendment against

21

22          [1]  Defendants indicate that plaintiff's FAC was improperly
    filed because the stipulation extending the time to amend claims

23  "merely created a deadline and did not supplant the dictates of
    F.R.C.P. 15(a) and Dist. Loc. R. 15.1."  (Defs.' Reply at n.3.)

24  In signing the stipulation, it was the court's understanding and
    intent to extend the deadline for the parties to amend the

25  pleadings pursuant to Rule 16(b)(4) without the necessity of a
    formal motion.  See Fed. R. Civ. P. 16(b)(4) ("A schedule may be

26  modified only for good cause and with the judge's consent.").  In
    any event, defendants have not suggested that they have suffered

27  any prejudice from the filing of the FAC and judicial economy
    favors assessing the merits of plaintiff's most recent complaint.

28

1   Sergeant Vogt; 3) a § 1983 claim for failure to provide medical

2   treatment in violation of plaintiff's right to substantive due

3   process against Sergeant Vogt, Deputy Stenger, and Detective

4   Louwsma; 4) a § 1983 claim against Sergeants Vogt and Robinson

5   under the theory of "supervisor liability for excessive force and

6   failure to provide medical treatment"; and 5) a § 1983 claim

7   against Sheriff Raney under the theory of "supervisor liability

8   for excessive force and failure to provide medical treatment."

9   (Docket No. 115.)  Defendants now move for summary judgment

10  pursuant to Rule 56 on the ground that plaintiff cannot establish

11  constitutional violations as a matter of law or, alternatively,

12  that the officers are entitled to qualified immunity.

13  II.  Legal Standard

14          Summary judgment is proper "if the movant shows that

15  there is no genuine dispute as to any material fact and the

16  movant is entitled to judgment as a matter of law."  Fed. R. Civ.

17  P. 56(a).  A material fact is one that could affect the outcome

18  of the suit, and a genuine issue is one that could permit a

19  reasonable jury to enter a verdict in the non-moving party's

20  favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

21  (1986).  The party moving for summary judgment bears the initial

22  burden of establishing the absence of a genuine issue of material

23  fact and can satisfy this burden by presenting evidence that

24  negates an essential element of the non-moving party's case.

25  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

26  Alternatively, the moving party can demonstrate that the non-

27  moving party cannot produce evidence to support an essential

28  element upon which it will bear the burden of proof at trial.

4

1    Id.

2         Once the moving party meets its initial burden, the

3    burden shifts to the non-moving party to "designate 'specific

4    facts showing that there is a genuine issue for trial.'"  Id. at

5    324 (quoting then-Fed. R. Civ. P. 56(e)).  To carry this burden,

6    the non-moving party must "do more than simply show that there is

7    some metaphysical doubt as to the material facts."  Matsushita

8    Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

9    "The mere existence of a scintilla of evidence . . . will be

10   insufficient; there must be evidence on which the jury could

11   reasonably find for the [non-moving party]."  Anderson, 477 U.S.

12   at 252.

13        In deciding a summary judgment motion, the court must

14   view the evidence in the light most favorable to the non-moving

15   party and draw all justifiable inferences in its favor.  Id. at

16   255.  "Credibility determinations, the weighing of the evidence,

17   and the drawing of legitimate inferences from the facts are jury

18   functions, not those of a judge . . . ruling on a motion for

19   summary judgment . . . ."  Id.

20   III. Analysis

21        A.   Constitutional Right Governing the Use of the Patrol Car

22             to Strike Plaintiff

23        Plaintiff challenges the constitutionality of Sergeant

24   Vogt having allegedly struck him with his patrol car under both

25   the Fourth Amendment and Due Process Clause.  "Where a particular

26   Amendment 'provides an explicit textual source of constitutional

27   protection' against a particular sort of government behavior,

28   'that Amendment, not the more generalized notion of "substantive

5

due process," must be the guide for analyzing these claims.'"
Albright v. Oliver, 510 U.S. 266, 273 (1994) (quoting Graham v.
Connor, 490 U.S. 386, 395 (1989)).  If the alleged force
resulting from Sergeant Vogt's use of his patrol car is covered
by the Fourth Amendment, plaintiff thus cannot assert a claim
based on a violation of substantive due process.

As the court explained in previous orders, the
constitutionality of Sergeant Vogt having allegedly struck
plaintiff with his patrol car must be assessed under the Fourth
Amendment if the incident amounted to a "seizure."  (See May 22,
2014 Order at 6:1-7:3; Aug. 25, 2014 Order at 6:17-7:9.)  "A
person is seized by the police and thus entitled to challenge the
government's action under the Fourth Amendment when the officer,
by means of physical force or show of authority, terminates or
restrains his freedom of movement, through means intentionally
applied."  Brendlin v. California, 551 U.S. 249, 254 (2007)
(internal quotations, citations, and emphasis omitted).

Assuming Sergeant Vogt struck plaintiff with his patrol
car and knocked him to the ground,[2] the undisputed evidence is
that plaintiff quickly returned to a standing position before

---

[2]   Although defendants deny that Sergeant Vogt struck
plaintiff with his patrol car, plaintiff established a genuine
issue of material fact as to that issue.  (See, e.g., Lloyd Aff.
Ex. 14 at 134:13 (Saetrum Dep.) (Docket No. 127-14) ("He hit me
with the front of his car . . . ."); Lloyd Aff. Ex. 10 at 44:10-
12 (Saxton Dep.) (Docket No. 127-10) ("Q. Where did you see [the
patrol car] strike Adam?  A. On the side.  He was walking, and it
hit him."); Lloyd Aff. Ex. 5 at 24:20-22 (Mitchell Dep.) (Docket
No. 127-4) ("At that time the cop car came down the middle of the
aisle and hit Adam in the knee . . . .").  The court will
therefore assume for purposes of this motion that Sergeant Vogt's
patrol car struck plaintiff.

6

1   Sergeant Vogt exited his patrol car.  (See Breckon Aff. Ex. A at

2   5:29:21 PM ("Breckon Patrol Car Video") (Docket No. 122-7).)

3   Because he was able to return to a standing position, defendants

4   argue that plaintiff did not submit to Deputy Vogt's authority

5   and therefore was not seized.  Actual submission is required,

6   however, only when an officer seeks to seize a person through a

7   show of authority without the use of physical force, such as

8   instructing an individual to stop.  See California v. Hodari D.,

9   499 U.S. 621, 626 (1991) ("An arrest requires either physical

10  force . . . or, where that is absent, submission to the assertion

11  of authority."); accord United States v. Smith, 633 F.3d 889, 893

12  (9th Cir. 2011); see also Hodari D., 499 U.S. at 624, 626 ("To

13  constitute an arrest,[]--the quintessential 'seizure of the

14  person' under our Fourth Amendment jurisprudence--the mere

15  grasping or application of physical force with lawful authority,

16  whether or not it succeeded in subduing the arrestee, was

17  sufficient. . . . The word 'seizure' readily bears the meaning of

18  a laying on of hands or application of physical force to restrain

19  movement, even when it is ultimately unsuccessful.").

20  Accordingly, even if defendants could prove that plaintiff fled

21  after returning to a standing position, these facts would not

22  preclude the use of the patrol car to strike plaintiff from

23  constituting a seizure.

24       To amount to a seizure under the Fourth Amendment,

25  Sergeant Vogt must have also terminated plaintiff's freedom of

26  movement "through means intentionally applied."  Brendlin, 551

27  U.S. at 254; see Lewis, 523 U.S. at 844 ("[N]o Fourth Amendment

28  seizure would take place where a 'pursuing police car sought to

1   stop the suspect only by the show of authority represented by

2   flashing lights and continuing pursuit,' but accidentally stopped

3   the suspect by crashing into him." (quoting Brower v. County of

4   Inyo, 489 U.S. 593, 597 (1989))).

5          Here, the video footage from Sergeant Vogt's patrol car

6   shows that Sergeant Vogt accelerated slightly when plaintiff

7   exited the white truck, continued to drive toward him, and may

8   have turned slightly toward plaintiff immediately before

9   stopping.  (Vogt Decl. Ex. B ("Vogt Patrol Car Video") at

10  5:29:17-5:29:24 PM.)  The only evidence before the court

11  regarding whether Sergeant Vogt intentionally hit plaintiff with

12  his patrol car came from Sergeant Vogt.  He indicates that his

13  "door may have bumped [plaintiff] when it opened," but that he

14  "never intended for [his] patrol car to be used as an impact

15  weapon."  (Vogt Decl. ¶ 17 (Docket No. 122-8); see also Vogt

16  Decl. Ex. A (Ada County Sheriff's Office Supplemental Report)

17  ("As I quickly put my patrol car in park and opened the driver's

18  door, the momentum caused the opening driver's door to bump

19  Saetrum near his right side and right arm.").)  Whether a jury

20  ultimately finds that Sergeant Vogt intentionally hit plaintiff

21  with his patrol car thus hinges on whether the jury finds

22  Sergeant Vogt's testimony credible.

23         "It has long been established that it is inappropriate

24  to resolve issues of credibility, motive, and intent on motions

25  for summary judgment.  It is equally clear that where such issues

26  are presented, the submission of affidavits or depositions is

27  insufficient to support a motion for summary judgment."  Hardin

28  v. Pitney-Bowes Inc., 451 U.S. 1008, 1009 (1981) (Rehnquist, J.,

dissenting from the denial of the petition for writ of certiorari); see also Provenz v. Miller, 102 F.3d 1478, 1489 (9th Cir. 1996) ("'Cases where intent is a primary issue generally are inappropriate for summary judgment unless all reasonable inferences that could be drawn from the evidence defeat the plaintiff's claim.'" (quoting Vaughn v. Teledyne, Inc., 628 F.2d 1214, 1220 (9th Cir. 1980))).

Here, because the issue of whether Sergeant Vogt intentionally used his patrol car to terminate plaintiff's freedom of movement hinges on Sergeant Vogt's intent and credibility, the court cannot weigh this evidence on a motion for summary judgment. See Crawford-El v. Britton, 523 U.S. 574, 599 (1998) ("[T]he defendant-official may move for partial summary judgment on objective issues that are potentially dispositive and are more amenable to summary disposition than disputes about the official's intent, which frequently turn on credibility assessments."). Plaintiff has thus established a triable issue as to whether Sergeant Vogt intentionally used his patrol car to strike plaintiff.

As previously discussed, whether Sergeant Vogt seized plaintiff when he allegedly struck him with his patrol car dictates whether that use of force is assessed under the Fourth Amendment or Due Process Clause. If Sergeant Vogt intentionally used his patrol car to strike plaintiff, plaintiff was subject to a seizure under the Fourth Amendment and the use of force must be assessed under that right. On the other hand, if Sergeant Vogt unintentionally struck plaintiff with his patrol car, plaintiff was not seized and the use of force would be subject only to the

9

1    limitations of substantive due process.  Because genuine issues

2    of material fact exist as to these threshold issues, the court

3    will assume that plaintiff was not seized for purposes of

4    plaintiff's § 1983 substantive due process claim and that

5    plaintiff was seized for purposes of plaintiff's § 1983 Fourth

6    Amendment claim.

7         B.   Substantive Due Process Claim Based on the Use of the

8              Patrol Car

9             The Due Process Clause of the Fourteenth Amendment

10   "guarante[es] more than fair process" and extends to "a

11   substantive sphere as well, barring certain government actions

12   regardless of the fairness of the procedures used to implement

13   them."  Lewis, 523 U.S. at 840.  "The touchstone of due process

14   is protection of the individual against arbitrary action of

15   government," Wolff v. McDonnell, 418 U.S. 539, 558 (1974), and

16   "only the most egregious official conduct can be said to be

17   'arbitrary in the constitutional sense,'" Lewis, 523 U.S. at 846

18   (quoting Collins v. City of Harker Heights, 503 U.S. 115, 129

19   (1992)).  The Supreme Court has held that official conduct rises

20   to this level only if it "shocks the conscience."  Lewis, 523

21   U.S. at 846.

22            The standard used to assess whether conduct "shocks the

23   conscience" depends on "whether the officers had the opportunity

24   for actual deliberation."  Porter v. Osborn, 546 F.3d 1131, 1138

25   (9th Cir. 2008).  "Where actual deliberation is practical, then

26   an officer's 'deliberate indifference' may suffice to shock the

27   conscience."  Wilkinson v. Torres, 610 F.3d 546, 554 (9th Cir.

28   2010).  "On the other hand, where a law enforcement officer makes

10

1   a snap judgment because of an escalating situation, his conduct

2   may only be found to shock the conscience if he acts with a

3   purpose to harm unrelated to legitimate law enforcement

4   objectives."  Id.; see also Porter, 546 F.3d at 1139 ("[W]hen an

5   officer encounters fast paced circumstances presenting competing

6   public safety obligations, the purpose to harm standard must

7   apply.").

8        In determining which standard governs, "the critical

9   consideration [is] whether the circumstances are such that

10  'actual deliberation is practical.'"  Moreland v. Las Vegas

11  Metro. Police Dep't, 159 F.3d 365, 372 (9th Cir. 1998).

12  "'[D]eliberation' should not be interpreted in the narrow,

13  technical sense," Wilkinson, 610 F.3d at 554, but occurs only

14  when "officials have the opportunity to deliberate various

15  alternatives prior to selecting a course of conduct," Tennison v.

16  City & County of San Francisco, 570 F.3d 1078, 1089 (9th Cir.

17  2009).

18        Sergeant Vogt first became involved in the plan to

19  arrest plaintiff after the controlled buy when he attended a

20  briefing about one hour before Officer Schneider was to meet

21  plaintiff to purchase marijuana.  (Vogt Decl. ¶ 7.)  When Officer

22  Schneider saw plaintiff driving toward the location where they

23  agreed to meet, he observed and informed the other officers that

24  there were two unidentified individuals in plaintiff's car.

25  (Schneider Decl. Ex. C.)  Because the officers' original arrest

26  plan was based on plaintiff being alone, they changed their plan

27  and split the arrest team so that Sergeant Vogt and Deputy

28  Stenger would arrest plaintiff while Deputies Piccola and Breckon

1    simultaneously "handle[d]" plaintiff's companions.  (Vogt Decl. ¶

2    11.)  The undisputed evidence shows that only two minutes and

3    forty-six seconds passed from the time Officer Schneider first

4    informed the Action Team that there were two unidentified

5    individuals in plaintiff's car until the time Officer Schneider

6    exited his truck to purportedly retrieve his money.  (Schneider

7    Decl. Ex. C; see also Vogt Decl. ¶ 10.)  The officers thus had

8    less than three minutes to develop their new arrest plan.

9          Plaintiff contends that the two minutes and forty-six

10   seconds provided Sergeant Vogt and the other officers with

11   adequate time to deliberate about and adjust their arrest plan in

12   light of the unanticipated individuals.  The court doubts that

13   less than three minutes to change an arrest plan in an

14   uncontrolled environment when two unidentified individuals

15   accompanied the suspect is sufficient time to deliberate.

16   Nonetheless, even if the court assumes that almost three minutes

17   was sufficient time for the officers to deliberate a new arrest

18   plan, the circumstances continued to change and the opportunity

19   to deliberate significantly decreased.

20         From the time Officer Schneider exited his truck until

21   "let me see your hands" can be heard on the recording,[3] only

22   forty-six seconds passed.  (Schneider Decl. Ex. C.)  During this

23   forty-six seconds, Sergeant Vogt and the other officers drove

24   from their discrete locations toward the white truck and

---

[3]     The video from Officer Breckon's patrol car shows that
the officers yelled "let me see your hands" to the unidentified
individuals in plaintiff's car.  (Breckon Patrol Car Video at
17:29:25 PM.)  "Let me see your hands" is yelled about one second
after Sergeant Vogt forces plaintiff to the ground.  (Id. at
17:28:24 PM.)

plaintiff's car and confronted all three individuals.  When
Sergeant Vogt began driving toward the white truck, he expected
that plaintiff would remain in the truck and that he would
effectuate a vehicle arrest.  (Vogt Decl. ¶ 12.)  This
understanding quickly changed when plaintiff unexpectedly exited
the truck and began walking away from it.  (Vogt Patrol Car Video
at 5:29:17 PM; Vogt Decl. ¶ 14.)  From the moment plaintiff
unexpectedly exited the truck until Sergeant Vogt allegedly
struck plaintiff with his patrol car, only seven seconds passed.
(See Vogt Patrol Car Video at 5:29:24 PM (showing when Sergeant
Vogt's patrol car stops).)

During these seven seconds, Sergeant Vogt had to
significantly alter his plan from arresting plaintiff in the
undercover truck to arresting him in a public parking lot.
During these seven seconds, Sergeant Vogt observed plaintiff
continue to walk toward his car after Sergeant Vogt activated his
overhead lights.  (Vogt Decl. ¶ 15.)  During these seven
seconds, Sergeant Vogt had to assess whether he believed
plaintiff was armed, posed a threat to the officers or public, or
was attempting to flee.  (See id. ¶¶ 15-16; Vogt Dep. 103:13-21,
105:14-106:8.)  Without question, the seven seconds did not
afford Sergeant Vogt "ample time," Porter, 546 F.3d at 1139, to
deliberate the potentially escalating change in circumstances
resulting from plaintiff exiting the truck and walking toward his
car.  Cf. Wilkinson, 610 F.3d at 545 (officer did not have time
to deliberate before firing eleven shots when the sequence of
events from the final PIT maneuver to the shots being fired was
only nine seconds).

1    While the circumstances here had not yet escalated to a

2    car chase like in Lewis and Wilkinson, Sergeant Vogt knew

3    plaintiff had a car nearby with two unknown individuals waiting

4    in it, thus a car chase was a realistic possibility if plaintiff

5    evaded arrest.  Sergeant Vogt had a mere seven seconds to

6    consider the possibility of plaintiff initiating a car chase in a

7    public parking lot and had to make a split-second decision about

8    how to quickly apprehend plaintiff.  Under the circumstances of

9    this case, a reasonable jury could not find that Sergeant Vogt

10   had "'extended opportunities'" in a "completely controlled

11   situation," Porter, 546 F.3d at 1139 (quoting Lewis, 523 U.S. at

12   853), to deliberate his plan to apprehend plaintiff.

13   Because Sergeant Vogt did not have time to deliberate

14   as a matter of law, plaintiff must show that Sergeant Vogt had

15   "the intent to inflict force beyond that which is required by a

16   legitimate law enforcement objective."  Porter, 546 F.3d at 1140

17   (internal quotation marks and citation omitted).  The use of

18   force alone, when utilized for a legitimate law enforcement

19   objective, is generally not evidence of an intent to harm.  See

20   Wilkinson, 610 F.3d at 545 ("[N]o intent to harm separate from a

21   legitimate law enforcement objective is evidenced by the mere

22   fact that [the officer] shot [the plaintiff], especially in the

23   escalating situation with [another officer] having fallen down,

24   the engine revving, and the tires throwing up mud.").

25   Plaintiff has not submitted any evidence even tending

26   to suggest that Sergeant Vogt intended to cause plaintiff harm

27   that was unrelated to his legitimate law enforcement objective of

28   apprehending him.  The only evidence before the court shows that

14

Sergeant Vogt made a "purely reactive decision," Porter, 546 F.3d at 1140, in light of quickly escalating circumstances that he did not create, see id. at 1141 ("When an officer creates the very emergency he then resorts to deadly force to resolve, he is not simply responding to a preexisting situation.  His motives must then be assessed in light of the law enforcement objectives that can reasonably be found to have justified his actions.").

The force utilized in this case is also relatively minimal compared to the numerous cases in which the force resulted in the death of the suspect. E.g., Lewis, 523 U.S. at 837; Wilkinson, 610 F.3d at 549; Porter, 546 F.3d at 1133.  When plaintiff was able to return to a standing position immediately after being hit and did not suffer any fractured bones, the force cannot rise to the "'rare situations where the nature of an officer's deliberate physical contact is such that a reasonable factfinder would conclude the officer intended to harm, terrorize or kill.'"  Porter, 546 F.3d at 1140 (quoting Lewis, 523 U.S. at 174).

Accordingly, the court must grant defendants' motion for summary judgment on plaintiff's § 1983 claim based on a violation of substantive due process because Sergeant Vogt did not have time to deliberate and plaintiff has not established a genuine issue of material fact as to whether Sergeant Vogt acted with an intent to cause harm unrelated to a legitimate law enforcement objective.  Because the court finds that Sergeant Vogt's use of his patrol car to strike plaintiff did not violate plaintiff's substantive due process rights as a matter of law, the court need not address Sergeant Vogt's claim of qualified

1  immunity.

2      C.  Fourth Amendment Excessive Force Claim

3          1.  Genuine Dispute as to Violation

4          Assuming plaintiff was seized when Sergeant Vogt struck

5  him with his patrol car, the constitutionality of that force must

6  be assessed under the Fourth Amendment.  Plaintiff also alleges

7  that Sergeant Vogt's immediate and forceful takedown exceeded the

8  limits of the Fourth Amendment.

9          "Fourth Amendment jurisprudence has long recognized

10  that the right to make an arrest . . . necessarily carries with

11  it the right to use some degree of physical coercion or threat

12  thereof to effect it."  Graham, 490 U.S. at 396.  While "police

13  officers need not employ the least intrusive degree of force . .

14  . the presence of feasible alternatives is a factor to include in

15  [the] analysis."  Bryan v. MacPherson, 630 F.3d 805, 813 (9th

16  Cir. 2010) (J., Wardlaw, concurring in the denial of rehearing en

17  banc) (internal quotation marks, citations, and emphasis

18  omitted).

19          To comport with the Fourth Amendment, officers' actions

20  must be "'objectively reasonable' in light of the facts and

21  circumstances confronting them."  Graham, 490 U.S. at 397.  This

22  inquiry "requires a careful balancing of the nature and quality

23  of the intrusion on the individual's Fourth Amendment interests

24  against the countervailing governmental interests at stake."  Id.

25  at 396 (internal quotation marks and citations omitted).  It

26  necessitates consideration of all of the relevant circumstances,

27  including "(1) the severity of the crime at issue; (2) whether

28  the suspect poses an immediate threat to the safety of the

16

officers or others; and (3) whether the suspect actively resists
detention or attempts to escape." Liston v. County of Riverside,
120 F.3d 965, 976 (9th Cir. 1997) (citing Graham, 490 U.S. at
388).  "[T]he jury must determine not only whether the officers
were justified in using force at all, but, if so, whether the
degree of force actually used was reasonable." Santos v. Gates,
287 F.3d 846, 854 (9th Cir. 2002).

The "most important" factor under Graham is whether the
suspect posed an "immediate threat to the safety of the officers
or others." Smith v. City of Hemet, 394 F.3d 689, 702 (9th Cir.
2005) (en banc) (quoting Chew, 27 F.3d at 1441).  "'A simple
statement by an officer that he fears for his safety or the
safety [of] others is not enough; there must be objective factors
to justify such a concern.'" Bryan, 630 F.3d at 826 (quoting
Deorle, 272 F.3d at 1281).  "A desire to resolve quickly a
potentially dangerous situation is not the type of governmental
interest that, standing alone, justifies the use of force that
may cause serious injury." Id. (quoting Deorle v. Rutherford,
272 F.3d 1272, 1281 (9th Cir. 2001)).

Whether an officer used excessive force under the
Fourth Amendment is a question for the jury, which "almost always
turn[s] on a jury's credibility determinations." Smith, 394 F.3d
at 701.  "Because such balancing nearly always requires a jury to
sift through disputed factual contentions, and to draw inferences
therefrom, [the Ninth Circuit has] held on many occasions that
summary judgment or judgment as a matter of law in excessive
force cases should be granted sparingly." Santos, 287 F.3d at
853.

1          Here, defendants contend that the changing

2   circumstances, unidentified individuals in plaintiff's car,

3   public location of the controlled buy, plaintiff's commission of

4   a felony, and the lack of knowledge the officers had about

5   whether plaintiff was armed show that plaintiff posed an

6   immediate risk to the safety of the officers and public.  While

7   these generalized considerations are relevant, a jury could

8   nonetheless find that plaintiff himself had done little to

9   suggest that he posed a threat to the safety of the officers or

10  public.  For example, Sergeant Vogt indicates only that plaintiff

11  was wearing lose clothing and, because he did not know whether

12  plaintiff was armed, he assumed it was possible.  (Vogt ¶ 16.)

13  There is no evidence, however, indicating that plaintiff was

14  actually armed or owned a weapon.  Sergeant Vogt based his

15  assumption solely on his impression that "drug dealers often

16  carry concealed weapons."  (Id.)  With only this non-

17  particularized evidence, a jury could conclude that a reasonable

18  officer would not have perceived a threat.

19          While Sergeant Vogt also indicates that it "appear[ed]

20  that [plaintiff] was getting ready to run," the undisputed

21  evidence is that he never ran or attempted to flee.  (Vogt Dep.

22  113:6-114:20.)  Determining whether plaintiff in fact posed a

23  risk to the officers or others thus requires a weighing of the

24  facts and the reasonable inferences drawn therefrom.  This is

25  precisely the type of inquiry reserved for the trier of fact.

26          The Ninth Circuit has also explained that "police

27  officers normally provide [] warnings where feasible, even when

28  the force is less than deadly, and that the failure to give such

a warning is a factor to consider." <u>Bryan</u>, 630 F.3d at 831.

When finding that the use of relatively minimal force in <u>Jackson</u>

<u>v. City of Bremerton</u> was not excessive as a matter of law, the

Ninth Circuit emphasized that the officers had warned the

plaintiffs in advance that a chemical irritant would be used if

they did not disperse.  268 F.3d 646, 650 (9th Cir. 2001).  The

Ada County Sheriff's Policy Manual on the Use of Force also

instructs officers that, "[w]henever practicable, the arresting

deputy should make clear his/her intent to arrest the person

before using force."  (Llyod Aff. Ex. 15, § 300.3.1 (Docket No.

127-15).)

       Here, Sergeant Vogt never informed plaintiff that he

was under arrest or gave him any warning or opportunity to comply

before resorting to force.  When asked why he did not give

plaintiff oral instructions to stop before allegedly hitting him

with his patrol car, Sergeant Vogt testified: "I was concerned

about him making it to his vehicle."  (Vogt Dep. 111:13-14.)

Upon exiting his car, Sergeant Vogt again did not give plaintiff

any warning or instruction before forcing him to the ground and

shouted for plaintiff to get to the ground only while he was

taking him down.  (<u>Id.</u> at 146:15-22; Vogt Decl. ¶ 17.)  Although

plaintiff was walking toward his car prior to being hit, the

undisputed evidence is that he never ran, even after allegedly

making eye contact with Sergeant Vogt as he drove toward

plaintiff.  (Vogt Dep. 113:6-114:20; Vogt Decl. ¶ 15.)  Taking

all inferences in favor of plaintiff, a jury could find that a

reasonable officer would have given plaintiff a warning or

opportunity to comply before immediately resorting to force.

1          With respect to the amount of force used, while

2    defendants deny that Sergeant Vogt intentionally hit plaintiff

3    with his patrol car, they do not appear to dispute that the use

4    of a patrol car as an impact weapon on a pedestrian is a

5    significant use of force.  Taking plaintiff to the ground, on the

6    other hand, could be considered a more minimal use of force, and

7    "[n]ot every push or shove, even if it may later seem unnecessary

8    in the peace of a judge's chambers' violates the Fourth

9    Amendment," Graham, 490 U.S. at 396.

10         Defendants rely on Jackson as a case in which the Ninth

11   Circuit held that a takedown, along with other "minimal" force,

12   comports with the Fourth Amendment.  268 F.3d at 652-53.  In

13   Jackson, however, the plaintiff alleged only that "three officers

14   pushed her to the ground to handcuff her" after she had gotten

15   "to her knees and [had] leaned down."  Id. at 650.  Even assuming

16   that the officers in Jackson utilized a similar takedown

17   technique as Sergeant Vogt, the circumstances in Jackson are

18   materially different than those in this case.  Most notably, the

19   officers in Jackson had "warned 'everyone' in advance" and the

20   Ninth Circuit found that the plaintiff's "active interference

21   posed an immediate threat to the officers' personal safety and

22   ability to control the group."  Id. at 650, 653.[4]

23   _____

24         [4]    Defendants also rely heavily on Liiv v. City of Coeur
     D'Alene, 130 Fed. App'x 848 (9th Cir. 2005), which is an
25   unpublished case and not citable.  See Ninth Cir. R. 36-3
     (providing that unpublished decisions are not precedent and
26   unpublished decisions issued before January 1, 2007 may be
     cited unless cited for one of three limited purposes).
27   Nonetheless, while the Ninth Circuit in Liiv affirmed the
     district court's grant of summary judgment in favor of the
28   officer despite allegations of a "violent[]" takedown, the

                                    20

1          In contrast to Jackson, the Ninth Circuit held in

2    Santos that the jury could find that the use of a takedown of an

3    intoxicated schizophrenic individual violated the Fourth

4    Amendment when the plaintiff allegedly suffered a broken vertebra

5    from the takedown.  287 F.3d at 853, 855.  In addition to

6    discussing other relevant circumstances, the Ninth Circuit

7    explained that "the officers admitted that Santos did not pose a

8    significant or immediate safety risk" and "did not struggle with

9    the officers but in fact evinced a willingness to submit to their

10   assertions of authority."  Id. at 854.  In distinguishing

11   Jackson, the Ninth Circuit emphasized that "the circumstances

12   surrounding the use of force in Jackson, as well as the extent of

13   the force applied by the officers in that case, differ

14   significantly from the events that occurred" in Santos.  Id. at

15   854-55.  Read together, these cases illustrate why the excessive

16   force inquiry "requires careful attention to the facts and

17   circumstances of each particular case and a careful balancing of

18   an individual's liberty with the government's interest in the

19   application of force."  Id. at 853 (internal quotation marks and

20   citation omitted).

21          Here, Sergeant Vogt testified during his deposition

22   that, if he arrests someone in an open-air situation based on a

23   controlled buy, he always takes that suspect to the ground.

24   (Vogt Dep. 120:21-121:2.)  The fact that plaintiff was being

25   arrested for a controlled buy alone does not take into account

26   ─────────────────────────

27   officer had ordered the plaintiff to leave the restricted area
     before using force and the plaintiff did not comply with the
     officer's request.  130 Fed. App'x at 850 & n.3.

28

1    all of the necessary considerations when weighing whether the

2    takedown was a reasonable use of force in the particular

3    instance.  It is also inconsistent with the Ada County Sheriff's

4    Office Policy Manuel on the Use of Force, which provides:

5    "Deputies . . . who have probable cause to believe that a person

6    has committed an offense may use reasonable force to effect the

7    arrest <u>if the person either attempts to flee or forcibly resists</u>

8    <u>arrest</u>."  (Llyod Aff. Ex. 15 (emphasis added)); <u>accord</u> Idaho Code

9    Crim. Proc. § 19-610 ("[I]f the person to be arrested either

10   flees or forcibly resists, the officer may use all reasonable and

11   necessary means to effect the arrest . . . .").

12       That plaintiff does not recall what happened after

13   Sergeant Vogt allegedly hit him with his patrol car and thus

14   cannot testify precisely how Sergeant Vogt took him to the ground

15   does not entitle defendants to judgment as a matter of law.  <u>See</u>

16   <u>Santos</u>, 287 F.3d at 851-52 (holding that the district court erred

17   in concluding that there was insufficient evidence of excessive

18   force simply because the plaintiff "did not specifically remember

19   being forced to the ground by defendant").  As the Ninth Circuit

20   explained in <u>Santos</u>, proof of excessive force does not require

21   direct evidence and "a jury's finding for a plaintiff in an

22   excessive force case may unquestionably rest on inferences drawn

23   from circumstantial evidence."  <u>Id.</u> at 852.

24       Here, the undisputed evidence is that Sergeant Vogt

25   forced plaintiff to the ground, (<u>see</u> Vogt Dep. 140:25-141:3,

26   146:16-18), and the jury could infer from the evidence of

27   plaintiff's injuries that the force used to effect the takedown

28   was excessive.  <u>See</u> <u>Santos</u>, 287 F.3d at 851-52 ("Simply because

22

Santos has no clear recollection of the act which he contends caused his severe injury does not mean that his claim must fail as a matter of law. . . . [A] jury might find the officers' testimony that they were restrained in their use of force not credible, and draw the inference from the medical and other circumstantial evidence that the plaintiff's injuries were inflicted on him by the officers' use of excessive force.").

In sum, a jury could find that it was unreasonable for Sergeant Vogt to intentionally hit plaintiff with his patrol car to stop him from walking and forcefully take him to the ground without warning even though plaintiff never attempted to flee or posed a threat to the officers or public.  Plaintiff has therefore established the existence of genuine issues of material fact as to whether Sergeant Vogt used excessive force against him in violation of the Fourth Amendment.

## 2.  Qualified Immunity

In suits under § 1983, "qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known.'"  Pearson v. Callahan, 555 U.S. 223, 232 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "For purposes of qualified immunity, [the court must] resolve all factual disputes in favor of the party asserting the injury."  Ellins v. City of Sierra Madre, 710 F.3d 1049, 1064 (9th Cir. 2013).  The clearly established inquiry "serves the aim of refining the legal standard and is solely a question of law for the judge."  Tortu v. Las Vegas Metro. Police Dep't, 556 F.3d 1075, 1085 (9th Cir.

2009).  To be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." Reichle v. Howards, --- U.S. ---, ---, 132 S.Ct. 2088, 2093 (2012) (internal quotation marks and citation omitted).

        Here, the numerous factual disputes prevent the court from meaningfully characterizing the right at issue in this case. For example, if the jury finds that Sergeant Vogt in fact hit plaintiff with his patrol car, the subsequent use of the takedown must be considered in light of those circumstances.  The jury must also determine whether a reasonable officer would have believed plaintiff was attempting to flee or posed a threat to the officers or public.  Until the jury resolves these disputed issues of fact, the court cannot adequately assess whether Sergeant Vogt violated clearly established law of which a reasonable officer would have known.  See Santos, 287 F.3d n.12 ("[I]t is premature to [decide qualified immunity] at this time, because whether the officers may be said to have made a 'reasonable mistake' of fact or law, may depend on the jury's resolution of disputed facts and the inferences it draws therefrom.  Until the jury makes those decisions, we cannot know, for example, how much force was used, and, thus, whether a reasonable officer could have mistakenly believed that the use of that degree of force was lawful.") (internal citation omitted); see also Luchtel v. Hagemann, 623 F.3d 975, 989 (9th Cir. 2010) (explaining that summary judgment should be granted "sparingly" in excessive force cases "even with respect to the issue of qualified immunity").

        Accordingly, because plaintiff has established a

genuine issue of material fact on his Fourth Amendment excessive

force claim against Sergeant Vogt and the numerous factual

disputes preclude the court from assessing qualified immunity at

this time, the court must deny defendants' motion for summary

judgment on that claim.

    D.  Medical Needs Claim

        When an individual has "not been convicted of a crime,

but ha[s] only been arrested, his rights derive from the due

process clause rather than the Eighth Amendment's protection."

Gibson v. County of Washoe, 290 F.3d 1175, 1187 (9th Cir. 2002)

(citing Bell v. Wolfish, 441 U.S. 520, 535 (1979)).  The Ninth

Circuit has nonetheless held that, "[w]ith regard to medical

needs, the due process clause imposes, at a minimum, the same

duty the Eighth Amendment imposes: 'persons in custody ha[ve] the

established right to not have officials remain deliberately

indifferent to their serious medical needs.'"  Id. (quoting

Carnell v. Grimm, 74 F.3d 997, 979 (9th Cir. 1996)) (second

alteration in original); see also Carnell, 74 F.3d at 979 ("[T]he

due process rights are at least as great as the Eighth Amendment

protections available to a convicted prisoner.") (emphasis

added).  The Supreme Court has also indicated, "Since it may

suffice for Eighth Amendment liability that prison officials were

deliberately indifferent to the medical needs of their prisoners,

it follows that such deliberately indifferent conduct must also

be enough to satisfy the fault requirement for due process claims

based on the medical needs of someone jailed while awaiting

1  trial." <u>Lewis</u>, 523 U.S. at 850.[5]

2          "Under the Eighth Amendment's standard of deliberate

3  indifference, a person is liable for denying a prisoner needed

4  medical care only if the person 'knows of and disregards an

5  excessive risk to inmate health and safety.'"  <u>Id.</u> (quoting

6  <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994); <u>see also</u> <u>Farmer</u>,

7  511 U.S. at 837 ("[T]he official must both be aware of facts from

8  which the inference could be drawn that a substantial risk of

9  serious harm exists, and he must also draw the inference.");

10 <u>Colwell v. Bannister</u>, 763 F.3d 1060, 1066 (9th Cir. 2014)

11 (explaining that a serious medical need exists if "failure to

12 treat the injury or condition 'could result in further

13 significant injury' or cause 'the unnecessary and wanton

14 infliction of pain.'"  (quoting <u>Jett v. Penner</u>, 439 F.3d 1091,

15 1096 (9th Cir. 2006))).

16          As discussed above, plaintiff has established a genuine

17 issue of material fact that Sergeant Vogt used excessive force

18 against him when he struck him with his patrol car and forcefully

19 took him to the ground.  Plaintiff further alleges that, as a

20          [5]    A recent Supreme Court decision calls into question
21 whether it is appropriate to borrow the Eighth Amendment standard
   when the claim is brought by an arrestee, not a convicted
22 prisoner, and whether the Due Process Clause may afford greater
   protection than the Eighth Amendment.  <u>See</u> <u>Kingsley v.</u>
23 <u>Hendrickson</u>, --- S.Ct. ----, 2015 WL 2473447, at *8 (U.S. June
   22, 2015) ("The language of the two Clauses differs, and the
24 nature of the claims often differs.  And, most importantly,
   pretrial detainees (unlike convicted prisoners) cannot be
25 punished at all . . . .").  The court need not resolve this
   issue, however, because it appears there would be little
26 practical difference between whether an arrestee's or pretrial
   detainee's medical needs claim is examined under a test akin to
27 that in <u>Kingsley</u> or the deliberate indifference standard from the
28 Eighth Amendment.

result of the takedown, he suffered a concussion and a loss of consciousness and has put forth evidence to raise a genuine dispute on these facts. (See Saetrum Aff. Exs. 1, 2.) The undisputed evidence is that plaintiff was unconscious for a maximum of one minute and, after regaining consciousness, did not complain of or show any visible signs of an injury. Plaintiff claims he had a serious medical need and that Sergeant Vogt, Detective Louwsma, and Deputy Stenger observed the use of force and his loss of consciousness and were deliberately indifferent when they did not obtain medical assistance or report the injuries to the jail. The court will exercise its discretion under Pearson to assume that plaintiff had a serious medical need and that the officers were deliberately indifferent to it and proceed to address qualified immunity. See Pearson, 555 U.S. at 236.

For purposes of qualified immunity, the court must continue to resolve all factual disputes in favor of plaintiff. Ellins, 710 F.3d at 1064. "[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known.'" Pearson, 555 U.S. at 232 (quoting Harlow, 457 U.S. at 818). To be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." Reichle, 132 S.Ct. at 2093 (internal quotation marks and citation omitted). "The proper inquiry focuses on whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted,' or whether the state of the law [at

the time of the incident] gave 'fair warning' to the officials
that their conduct was unconstitutional." Clement v. Gomez, 298
F.3d 898, 906 (9th Cir. 2002) (quoting Saucier, 533 U.S. at 202;
Hope v. Pelzer, 536 U.S. 730 (2002)).  The clearly established
inquiry "is solely a question of law for the judge." Tortu, 556
F.3d at 1085.

Whether the unlawfulness of certain conduct is clearly
established "depends largely 'upon the level of generality at
which the relevant "legal rule" is to be identified.'" Wilson,
526 U.S. at 614 (quoting Anderson, 483 U.S. at 639).  The right
must be defined in a "particularized, and hence more relevant,
sense," requiring a court to strike a balance between defining a
right too generally so that the definition necessarily leads to
the conclusion that the right is clearly established and defining
the right too narrowly so that prior precedent must mirror the
facts of the case in order to conclude that the right has been
clearly established. Saucier, 533 U.S. at 202-03.

For purposes of a medical needs claim under the Eighth
Amendment, the Ninth Circuit has held that the deliberate
indifference standard sufficiently particularizes the right at
issue.  See Kelley v. Borg, 60 F.3d 664, 667 (9th Cir. 1995)
(explaining that the "Eighth Amendment rights in the prison
medical context" have "already been particularized") (emphasis
omitted); accord Newell v. Sauser, 79 F.3d 115, 117 & n.3 (9th
Cir. 1996).  The Ninth Circuit has also held that the Eighth
Amendment's guarantee that prisoners have "a right to officials
who are not 'deliberately indifferent to serious medical needs'"
is clearly established. Id.  At least among most circuit courts,

1   it is also clearly established that this same standard governs

2   medical needs claims by arrestees.  <u>Gibson</u>, 290 F.3d at 1187; <u>see</u>

3   <u>also, e.g.,</u> <u>Estate of Booker v. Gomez</u>, 745 F.3d 405, 433 (10th

4   Cir. 2014) ("We have previously observed there is little doubt

5   that deliberate indifference to an inmate's serious medical need

6   [violates] a clearly established constitutional right.  This

7   principle also clearly applies to pretrial detainees through the

8   due process clause of the Fourteenth Amendment.") (internal

9   quotation marks and citations omitted) (alteration in original).[6]

10

11          [6]     An overwhelming majority of the circuits apply the
     deliberate indifference standard to medical needs claims by
12   arrestees.  <u>See, e.g.,</u> <u>Kollin v. City of Cleveland</u>, 557 Fed.
     App'x 396, 399 (6th Cir. 2014); <u>Smith v. Gransden</u>, 553 Fed. App'x
13   173, 177 (2d Cir. 2014); <u>Thompson v. King</u>, 730 F.3d 742, 745-46
     (8th Cir. 2013); <u>Carter v. DeKalb County</u>, 521 Fed. App'x 725, 729
14   (11th Cir. 2013); <u>Childress v. Harms</u>, 449 Fed. App'x 758, 759-60
     (10th Cir. 2011); <u>Abshure v. Prator</u>, 392 Fed. App'x 267, 269 (5th
15   Cir. 2010); <u>Jennings v. Fetterman</u>, 197 Fed. App'x 162, 165 (3d
     Cir. 2006).  With the exception of the Seventh Circuit, all of
16   the circuits apply the deliberate indifference standard to
     medical needs claims by pretrial detainees.  <u>See, e.g.,</u> <u>Nouri v.</u>
17   <u>County of Oakland</u>, --- Fed. App'x ----, 2015 WL 3650168, at *3
     (6th Cir. June 12, 2015); <u>Morrison v. City of Atlanta</u>, --- Fed.
18   App'x ----, 2015 WL 3561228, at *4 (11th Cir. June 9, 2015);
     <u>Montgomery v. Aparatis Dist. Co.</u>, --- Fed. App'x ----, 2015 WL
19   1600521, at *2 (3d Cir. Apr. 10, 2015); <u>Penn v. Escorsio</u>, 764
     F.3d 102, 110 (1st Cir. 2014); <u>Jackson v. Buckman</u>, 756 F.3d 1060,
20   1065 (8th Cir. 2014); <u>Estate of Booker v. Gomez</u>, 745 F.3d 405,
     429 (10th Cir. 2014); <u>Nielsen v. Rabin</u>, 746 F.3d 58, 63 n.3 (2d
21   Cir. 2014); <u>Silva v. Moses</u>, 542 Fed. App'x 308, 310 (5th Cir.
     2013); <u>Lenhart v. Pennsylvania</u>, 528 Fed. App'x 111, 115 (3d Cir.
22   2013).
             The Seventh Circuit distinguishes between arrestees and
23   pretrial detainees and evaluates arrestee's medical needs claims
     under the Fourth Amendment:
24

25          The relevant legal standard for arrestees who have
            been seized but who have not yet had their probable
26          cause hearing, we conclude, comes from the Fourth
            Amendment, not the Fourteenth, and certainly not the
27

28

1    Even if the law is clearly established, "an officer who

2  makes a reasonable mistake as to what the law requires under a

3  given set of circumstances is entitled to the immunity defense."

4  Landry v. Berry, 533 F. App'x 702, 703 (9th Cir. 2013) (quoting

5  Boyd v. Benton County, 374 F.3d 773, 781 (9th Cir. 2004)).  "The

6  protection of qualified immunity applies regardless of whether

7  the government official's error is 'a mistake of law, a mistake

8  of fact, or a mistake based on mixed questions of law and fact.'"

9  Pearson, 555 U.S. at 231 (quoting Groh v. Ramirez, 540 U.S. 551,

10  567 (2004) (Kennedy, J., dissenting)).

11

12        Eighth.   The  issue  is  whether  the  state  actor's
          response   to  [the  arrestee]'s  medical  needs  was
13        objectively unreasonable and caused the harm of which
          [the arrestee] complains.

14
   Currie v. Chhabra, 728 F.3d 626, 631 (7th Cir. 2013) (internal
15  quotation marks and citations omitted) (alterations in original);
   see also Pittman ex rel. Hamilton v. County of Madison, 746 F.3d
16  766, 775 (7th Cir. 2014) (applying the Eighth Amendment
   deliberate indifference standard to pretrial detainees' medical
17  needs claims).
        As previously noted, Kingsley may suggest that courts should
18  not borrow from the Eighth Amendment to assess a medical needs
   claim by an arrestee or pretrial detainee.  The fact that the
19  Supreme Court has not articulated the precise standard governing
   a medical needs claim by an arrestee or pretrial detainee could
20  be seen as undermining the conclusion that the right is clearly
   established.  However, because the contours of the right under
21  any test adopted from Kingsley appear to be similar to the
   standard borrowed from the Eighth Amendment, Kingsley does not
22  prevent the right at issue in this case from being clearly
   established.  See Saucier v. Katz, 533 U.S. 194, 202-03 (2001)
23  ("Assuming, for instance, that various courts have agreed that
   certain conduct is a constitutional violation under facts not
24  distinguishable in a fair way from the facts presented in the
   case at hand, the officer would not be entitled to qualified
25  immunity based simply on the argument that courts had not agreed
   on one verbal formulation of the controlling standard."),
26  overruled in part on other grounds by Pearson v. Callahan, 555
   U.S. 223 (2009).
27

28
                                30

1          Here, it is undisputed that if plaintiff was

2    unconscious it was for a maximum of one minute and, upon

3    regaining consciousness, did not have any visible signs of an

4    injury or indicate any concerns to the officers.  Plaintiff

5    nonetheless argues that a reasonable officer would have obtained

6    medical assistance or reported an injury to the jail based

7    exclusively on the force used against plaintiff and the fact that

8    he temporarily lost consciousness.

9          In cases where circuit courts have held that officers

10   were not entitled to qualified immunity when they failed to

11   provide medical assistance, the plaintiffs' injuries would have

12   been obvious to any reasonable officer.  For example, in Booker,

13   officers put an arrestee in a "carotid restraint," which the

14   officers were taught as a technique to "compress[] the carotid

15   arteries and [diminish] the supply of oxygenated blood to the

16   brain . . . while concurrently sealing the jugular vein which

17   returns the deoxygenated blood."  745 F.3d at 413 (internal

18   quotation marks and citation omitted).  After employing this

19   technique for over a minute, other officers proceeded to use

20   additional pain compliance techniques, nunchakus, and a tazer on

21   the arrestee while the arrestee was mostly "motionless on the

22   floor."  Id. at 413-15.  The officers then restrained the

23   arrestee and carried his "limp and unconscious" body by his limbs

24   to a cell where they placed him face down.  Id. at 415, 431.

25   None of the officers took his vitals or attempted to assess

26   whether he needed medical care before leaving him in the cell.

27   Id. at 415.

28          Similar to Booker, other circuit courts have found that

                                   31

officers were not entitled to qualified immunity when they failed to provide medical assistance to an individual who had continuing serious injuries that were either obvious or reported to the officers.  See McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009) (explaining that it had previously "affirmed the denial of qualified immunity when an officer was aware of the inmate's medical issues, knew the inmate had complained of breathing trouble and chest pain, but waited for other officers to ask him to initiate medical treatment"); Estate of Owensby v. City of Cincinnati, 414 F.3d 596, 603-04 (6th Cir. 2005) (denying qualified immunity when "each officer viewed Owensby in significant physical distress, yet made no attempt to summon or provide any medical care until several minutes later"); Bozeman v. Orum, 422 F.3d 1265, 1274 (11th Cir. 2005) (noting that "[m]ost cases in which deliberate indifference is asserted are far from obvious violations of the Constitution" but that the officers were not entitled to qualified immunity when they delayed in providing medical treatment to a pretrial detainee who "was unconscious and not breathing"), abrogated on other grounds by Kingsley, 135 S. Ct. 2466.

    Here, neither side presented evidence about whether a temporary loss of consciousness like the plaintiff experienced in this case is a serious medical condition or, even assuming it is, that the seriousness would be obvious to a reasonable officer.  Although the court assumes plaintiff had a serious medical need for purposes of this motion, it is not obvious to this court whether such a temporary loss of consciousness necessitates immediate medical treatment or that a concussion is

32

an obvious risk from a temporary loss of consciousness.  Cases

such as Booker, where the plaintiff lost consciousness and

remained unconscious due to an inability to breathe, do not give

officers fair notice that the Constitution requires officers to

obtain medical assistance for an individual who suffers a

temporary loss of consciousness without any observable injury.

Nor do the deliberate indifference and serious medical need

standards invite simplistic application based on a single fact,

such as the loss of consciousness.  Cf. Lemire v. Cal. Dep't of

Corr. & Rehab., 726 F.3d 1062, 1082-83 (9th Cir. 2013)

(recognizing that the Ninth Circuit has found that the failure to

"provide CPR or other life-saving measures to an inmate in

obvious need can provide the basis for liability," but does "not

necessarily amount to deliberate indifference") (emphasis added);

see also Bozeman, 422 F.3d at 1274 ("Most cases in which

deliberate indifference is asserted are far from obvious

violations of the Constitution.").

        Unlike Booker and other circuit cases in which a

reasonable officer would not fail to understand the need for

action, this case is more analogous to Gibson.  In Gibson, the

defendant officers had not been informed that the combative

arrestee suffered from a manic depressive disorder and needed

psychiatric treatment.  290 F.3d at 1180, 1196.  The Ninth

Circuit ultimately concluded that even though the officers'

failure to provide medical treatment "proved fatal," it was not

unconstitutional.  Id. at 1196.  The officers' conduct comported

with the Fourteenth Amendment because "all the deputies at the

jail knew about [plaintiff's] mental condition was what they

could observe of his behavior" and there was "no evidence that

any of them actually knew that this behavior connoted serious,

treatable mental illness." Id. at 1197.  The Ninth Circuit

emphasized that the plaintiff was not "so obviously mentally ill

that the deputies, who had received no training regarding the

diagnosis and treatment of mental illness, must have known that

Gibson was exhibiting symptoms of mental illness." Id.  Like the

plaintiff in Gibson, the plaintiff's outward appearance after

regaining consciousness would not have made it clear to a

reasonable officer that he had sustained a concussion or other

injury.

        The training the officers received in Booker further

distinguishes why a reasonable officer would have known that

medical treatment was necessary in that case.  The officers in

Booker were trained that a carotid restraint could render a

person unconscious within ten to twenty seconds and that "[b]rain

damage or death could occur if the technique is applied for more

than one minute."  745 F.3d at 413 (internal quotation marks,

citation, and emphasis omitted) (alteration in original).

Despite having been trained about the "foreseeable, rapid, and

deadly consequences" from using a carotid restraint for over a

minute, an officer nonetheless proceeded to use it for longer

than a minute.  Id. at 432.  Because the purpose of the technique

in Booker was to render a person unconscious and the officers

were trained that the duration they used it for could be fatal, a

reasonable officer could not mistakenly believe that the

individual successfully rendered unconscious from prolonged use

of the technique did not require medical assistance.  The

1    training the officers received in Booker was critical to the

2    Tenth Circuit's conclusion that they were not entitled to

3    qualified immunity.  See id. at 434 ("[T]he contours of the right

4    are clearly established such that any reasonable officer in the

5    Defendants' position (and with their training) would have known

6    that failing to check Mr. Booker's vital signs, perform CPR, or

7    seek medical care for three minutes when he was limp and

8    unconscious as a result of the Defendants' use of force could

9    violate the Constitution.") (emphasis added).

10          Here, however, a takedown is not employed to render a

11   person unconscious and there is no evidence that the officers

12   were trained that a takedown could result in serious or fatal

13   injuries.  Similar to Gibson, there is no evidence that the

14   officers received training about whether medical treatment is

15   necessary under all circumstances when a suspect loses

16   consciousness after hitting his head but quickly regains

17   consciousness without any visible signs of an injury.  Especially

18   in the absence of training to the contrary, an officer would be

19   reasonable in concluding that medical assistance was unnecessary

20   for an individual who quickly regains consciousness and does not

21   complain of or show any signs of an injury.

22          Plaintiff relies primarily on the Ada County Sheriff's

23   Office Policy Manual on the Use of Force to argue that the

24   officers were on notice that medical treatment was necessary.

25   The Use of Force Policy provides, "[p]rior to booking or release,

26   medical assistance shall be obtained for any person . . . who was

27   rendered unconscious."  (Lloyd Decl. Ex. 15 at 4.)  In Drummond

28   ex rel. Drummond v. City of Anaheim, the Ninth Circuit explained

                                    35

that police department training materials are relevant for purposes of qualified immunity when assessing "whether reasonable officers would have been on notice that the force employed was objectively unreasonable." 343 F.3d 1052, 1062 (9th Cir. 2003). In that case, the officers had "kneel[ed] on the back and neck of a compliant detainee, and press[ed] the weight of two officers' bodies on him even after he complained that he was choking and in need of air." Id. at 1062. The officers utilized this force despite the fact that their own departmental training materials specifically warned that, "when one or more [officers] are kneeling on a subject's back or neck to restrain him, compression asphyxia can result [t]hat may be a precipitating factor in causing death." Id. at 1061-62 (internal quotation marks omitted) (alterations in original).

Unlike in Drummond, Ada County's Use of Force Policy does not articulate the cause and deadly consequences of the exact technique used on plaintiff. Because the Use of Force Policy does not explain why medical assistance is necessary for an individual who "was rendered unconscious," it cannot put a reasonable officer on notice that the failure to obtain medical assistance after a person regains consciousness could cause greater harm. The policy simply does not provide the officers with the necessary medical training to put it beyond debate that failing to obtain medical assistance in this case violated a clearly established right of which a reasonable officer would know.

The contemplated timing of the policy, which instructs officers to obtain medical assistance "[p]rior to booking or

36

release," also fails to put the arresting officers on notice that
the responsibility to obtain medical assistance in this case
rested with them.  The Constitution requires "jails [to] provide
medical staff who are 'competent to deal with prisoners'
problems.'"  Gibson, 290 F.3d at 1187 (quoting Hoptowit v. Ray,
682 F.2d 1237, 1253 (9th Cir. 1982)).  A reasonable officer could
have believed that if plaintiff discovered any injury or began to
show any signs of an injury--which he did not during the
officers' encounter with him--the trained staff at the jail would
adequately respond to his needs.  It is without question that the
jail is better equipped to make such medical decisions about non-
obvious injuries than officers effecting an arrest under
escalating circumstances.

        The Supreme Court has repeatedly emphasized that
"'[q]ualified immunity gives government officials breathing room
to make reasonable but mistaken judgments,' and 'protects "all
but the plainly incompetent or those who knowingly violate the
law."'"  Stanton v. Sims, --- U.S. ---, ---, 134 S.Ct. 3, 5
(2013) (citations omitted).  The court cannot conclude that the
officers' inaction after plaintiff quickly regained consciousness
and neither complained of nor exhibited any signs of injury was
plainly incompetent or shows that they knowingly violated the
law.  To the contrary, it would not have been obvious to a
reasonable officer that plaintiff suffered from a serious medical
condition and that the Constitution required medical assistance.
Accordingly, the officers are entitled to qualified immunity and
the court must grant defendants' motion for summary judgment on
plaintiff's medical needs claim against Sergeant Vogt, Detective

1  Louwsma, and Deputy Stenger.

2      E.  Claims Against the Supervisor Defendants

3          "Because vicarious liability is inapplicable to . . . §

4  1983 suits, a plaintiff must plead that each Government-official

5  defendant, through the official's own individual actions, has

6  violated the Constitution."  Ashcroft v. Iqbal, 556 U.S. 662, 676

7  (2009).  "A defendant may be held liable as a supervisor under §

8  1983 if there exists either (1) his or her personal involvement

9  in the constitutional deprivation, or (2) a sufficient causal

10  connection between the supervisor's wrongful conduct and the

11  constitutional violation."  Starr v. Baca, 652 F.3d 1202, 1207

12  (9th Cir. 2011). The Ninth Circuit has stated that supervisors

13  may be held liable under § 1983 under the following theories:

14      "(1) for setting in motion a series of acts by others,
        or knowingly refusing to terminate a series of acts by
15      others, which they knew or reasonably should have
        known would cause others to inflict constitutional
16      injury; (2) for culpable action or inaction in
        training, supervision, or control of subordinates; (3)
17      for acquiescence in the constitutional deprivation by
        subordinates; or (4) for conduct that shows a
18      'reckless or callous indifference to the rights of
        others.'"
19

20  Moss v. U.S. Secret Serv., 675 F.3d 1213, 1231 (9th Cir. 2012)

21  (quoting al-Kidd v. Ashcroft, 580 F.3d 949, 965 (9th Cir. 2009),

22  rev'd on other grounds, Ashcroft v. al-Kidd, 131 S. Ct. 2074

23  (2011)).[7]

24  _____

25      [7]  The Ninth Circuit's enumeration of cognizable theories
    of liability against a supervisor preceded Iqbal, which clarified
    that a supervisor could be held liable only "through the
26  official's own individual actions," Iqbal, 556 U.S. at 676.  The
    plaintiffs in Moss alleged § 1983 claims based on Fourth
27  Amendment violations and the Ninth Circuit recognized that,
    because al-Kidd was decided pre-Iqbal, the "extent to which its
28  supervisory liability framework is consistent with that decision

1          Plaintiff first alleges that Sergeant Vogt "knowingly

2    refus[ed] to terminate the series of acts by himself and the

3    other members of the Action Team" and "fail[ed] to supervise and

4    control the members of the Action Team."  (FAC ¶ LXXXV.)   The

5    conduct giving rise to plaintiff's § 1983 claims is the use of

6    force by Sergeant Vogt and failure to provide medical treatment

7    by Sergeant Vogt, Deputy Stenger, and Deputy Louwsma.  Any

8    "supervisor liability" claim against Sergeant Vogt based on his

9    failure to adequately supervise himself is nonsensical and adds

10   nothing to plaintiff's case.

11         The only other member of the Action Team alleged to

12   have violated plaintiff's rights is Deputy Stenger.  Plaintiff

13   has not put forth any evidence showing how Sergeant Vogt, in his

14   role as supervisor, caused Deputy Stenger to inadequately

15   respond to plaintiff's medical needs.  Moreover, any such claim

16   based on Sergeant Vogt's supervisory role is duplicative and

17   seeks to remedy the precise injury allegedly caused by Sergeant

18   Vogt's own allegedly inadequate response to plaintiff's medical

19   needs.[8]  The court must therefore grant defendants' motion for

20

21   and remains good law has been debated."  Moss, 675 F.3d at 1231
     n.6 (citing al-Kidd, 598 F.3d at 1141 (O'Scannlain, J.,

22   dissenting from denial of rehearing en banc); Bayer v. Monroe
     Cnty. Children & Youth Servs., 577 F.3d 186, 191 n.5 (3d Cir.

23   2009); Maldonado v. Fontanes, 568 F.3d 263, 274 n.7 (1st Cir.
     2009)).  The Ninth Circuit nonetheless declined "to consider that

24   debate" because the plaintiffs did not "allege sufficient facts
     to meet the standard set forth in al-Kidd."  Id.  Similar to

25   Moss, the court recognizes the uncertainty of the supervisor
     liability standard governing Fourth Amendment claims, but need

26   not resolve the issue because plaintiff has not submitted
     sufficient evidence to withstand summary judgment under any of

27   the potential theories.
            [8]   Any theory of liability based on Sergeant Vogt having

28   allegedly warned other officers to turn off their mics fails to
     allege a cognizable violation of the Constitution.  While that

                                   39

1    summary judgment on plaintiff's fourth claim against Sergeant

2    Vogt.

3              Sergeant Robinson was allegedly the supervisor of

4    Deputy Louwsma during the undercover purchase and arrest.

5    Plaintiff alleges that Sergeant Robinson "knowingly refus[ed] to

6    terminate the series of acts" by Deputy Louwsma that lead to a

7    violation of plaintiff's rights.  Plaintiff does not, however,

8    allege or submit any evidence suggesting that Sergeant Robinson

9    witnessed the alleged use of excessive force or had any

10   knowledge that plaintiff was injured during the arrest.  (See

11   Robinson Decl. ¶¶ 6-7.)  Absent such knowledge, Sergeant

12   Robinson could not have had any "personal involvement in the

13   constitutional deprivation" and there is not "a sufficient

14   causal connection between" Sergeant Robinson's inaction and

15   Deputy Louwsma's conduct.  Starr, 652 F.3d at 1207. Similarly,

16   Sergeant Robinson's approval of Deputy Louwsma's report

17   indicating that excessive force was not used against plaintiff

18   does not give rise to a cognizable claim in the absence of

19   evidence showing that Sergeant Robinson knew the statement was

20   false.[9]  Accordingly, because plaintiff fails to allege--let

21   _____

     evidence may be relevant circumstantial evidence as to
22   plaintiff's claims against Sergeant Vogt, advising officers to
     turn off their mics alone does not amount to the deprivation of a
23   constitutional right.

           [9]   As discussed in more detail in the court's August 25,
24   2014 Order, even if Sergeant Robinson knew that Deputy Louwsma's
     statement as to the use of force was false, mere approval of
25   misconduct after it occurred cannot give rise to a claim against
     a supervisor.  (See generally Aug. 25, 2014 Order at 11:24-12:5
26   ("[A supervisor's] inaction occurring exclusively after the
     alleged violations cannot plausibly allege 'a sufficient causal
27   connection between the supervisor's wrongful conduct and the
     constitutional violation.'  Although the Ninth Circuit has upheld

28

                                  40

1   alone submit evidence supporting--a claim against Sergeant

2   Robinson, the court must grant defendants' motion for summary

3   judgment on plaintiff's fourth claim against Sergeant Robinson.

4        Plaintiff's fifth claim against Sheriff Raney alleges

5   that various officers violated the Ada County Sheriff Office's

6   Use of Force and Use of Audio/Video Recorders policies because

7   of "Sheriff Raney's failure to train and/or supervise and

8   control his deputies and their supervisors."  (FAC ¶¶ XCVIII-

9   XCIX.)  The court previously held that such conclusory

10  allegations as to Sheriff Raney were insufficient to withstand a

11  motion to dismiss.  (See Aug. 25, 2014 Order at 10:8-13

12  ("[P]laintiff alleges that the constitutional violations

13  occurred as a result of Sheriff Raney's 'failure to properly

14  train, supervise and control' the deputy defendants.  These

15  allegations, however, lack any factual support and are therefore

16  insufficient under Iqbal.") (internal citation omitted); see

17  also Aug. 25, 2014 Order at 10:13-8-13 (citing cases and

18  discussing authority).)  Without citing a single piece of

19  evidence to support these conclusory allegations, plaintiff's

20  allegations amount to nothing more than an attempt to hold

21
    supervisor liability based on the supervisor's 'knowledge of and
22  acquiescence in unconstitutional conduct by his or her
    subordinates,' the plaintiff must still show that 'the supervisor
23  breached a duty to plaintiff which was the proximate cause of the
    injury.' (quoting Starr, 652 F.3d at 1207)); Aug. 25, 2014 Order
24  at 12:19-26 ("A supervisor's conduct is therefore sufficient to
    'establish the requisite causal link only when the supervisor
25  engaged in at least some type of conduct before the
    unconstitutional incident and the supervisor knew or should have
26  known that his conduct could cause the constitutional violation
    the plaintiff suffered.'" (quoting Jones v. County of Sacramento,
27  Civ. No. 2:09-1025 WBS DAD, 2010 WL 2843409, at *7 (E.D. Cal.
    July 20, 2010)); see also Starr, 652 F.3d at 1208.

28

Sheriff Raney vicariously liable for the conduct of his subordinates.

For the first time at oral argument, plaintiff sought to hold Sheriff Raney liable for adopting an allegedly unconstitutional policy.[10]  Specifically, plaintiff contends that the Ada County Sheriff's Office Policy Manual on the Use of Force unconstitutionally vests officers with discretion in deciding when to give a verbal warning or instruction to a suspect before using force.  (E.g., Llyod Aff. Ex. 15, § 300.3.1 ("Given that no policy can realistically predict every possible situation a deputy might encounter, deputies are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.").)  The Policy Manual on the Use of Force, which generally tracks the Graham objective reasonableness test, (see id. §§ 300.2, 300.3, 300.3.1, 300.3.2), instructs officers that, "[w]henever practicable, the arresting deputy should make clear his/her intent to arrest the person before using force," (id. § 300.3.1).  Plaintiff has not cited a single case, and the court is not aware of one, that suggests a policy vesting officers with discretion in utilizing reasonable force and advising the officers to warn a suspect

---

[10]   A claim based on the unconstitutionality of a policy is generally brought against the municipality under Monell v. Department of Social Services, 436 U.S. 658 (1978).  See generally Gillette v. Delmore, 979 F.2d 1342, 1346 (9th Cir. 1992) ("A section 1983 plaintiff may establish municipal liability . . . [by showing] that the individual who committed the constitutional tort was an official with 'final policy-making authority' and that the challenged action itself thus constituted an act of official governmental policy." (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 480–81 (1986))).

1  before resorting to force when it is practicable is inadequate

2  under the Fourth Amendment.  Accordingly, the court must grant

3  defendants' motion for summary judgment on plaintiff's fifth

4  claim against Sheriff Raney.

5          IT IS THEREFORE ORDERED that defendants' motion for

6  summary judgment be, and the same hereby is, GRANTED with respect

7  to plaintiff's first, third, fourth, and fifth claims and DENIED

8  with respect to plaintiff's second claim.  The remaining claim

9  for trial is plaintiff's § 1983 claim for excessive force against

10  Sergeant Vogt.

11  Dated:  August 7, 2015

12

WILLIAM B. SHUBB
13                                  UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28